**IN THE UNITED STATES COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**

**MICHAEL HOLDER**

**Plaintiff,**

**v.**

**CNH INDUSTRIAL AMERICA, LLC**

**Defendant.**

**Case No.: 19-cv-1194**

## COMPLAINT

Plaintiff Michael Holder ("Holder") files this complaint against CNH Industrial America, LLC ("CNH"). In support thereof, Plaintiff states the following:

## INTRODUCTION

1. CNH is the American subsidiary of a global Dutch conglomerate that manufacturers agricultural equipment. For years, CNH has carried out a deceptive, unfair, and unlawful scheme to induce farmers to purchase $500,000 Module Express cotton pickers which it knows to be fundamentally flawed and which cannot reliably the perform the very task for which they are designed: picking and building cotton modules in one piece of equipment.

2. The Module Express was purported to represent a revolution in cotton harvesting: a single piece of equipment that could both pick cotton and pack it into modules. But CNH rushed its picker to market, intent on beating John Deere (which was also designing a picker-baler) and increasing its share of the American cotton market. CNH knew that its Module Express pickers suffered from fundamental design defects—including problems with the power, hydraulic, module packing, and software systems—and continual, crippling manufacturing process failures, and that this incredibly expensive piece of farm equipment would never function correctly.

3.     Despite this knowledge, CNH carried out a methodical scheme to falsely represent specific characteristics of the Module Express with the intent and effect of inducing unsuspecting farmers into buying them.  After farmers purchase a Module Express picker (and invariably face repeated mechanical failures) CNH deliberately misrepresents the nature of the problem as fixable and isolated, causing farmers to keep their pickers, trade in for "new model" pickers, and not realize their legal claims.

4.     CNH buys back previously-sold Module Express pickers that have proven to be effectively useless from farmers at hugely deflated values.  It then takes these pickers—which it knows cannot successfully operate to pick and bale cotton—and re-sells them to other farmers, based upon false representations that they are fully operational and reliable.  It does so without disclosing the glut of failures and repair claims that these specific machines experienced, and by making specific representations as to their operability.

5.     Further, CNH has consistently failed to provide the parts and service necessary for repairs while preventing farmers from having access to the manuals and parts necessary to attempt to fix the Module Express pickers outside of the CNH network.

6.     Through its deliberate, pernicious conduct CNH has caused millions of dollars of harm to cotton farmers who often cannot absorb such losses without catastrophic effects to their livelihoods.

7.     Plaintiff is among the many farmers who have been harmed through CNH's conduct, and has incurred individual damages, including consequential damages such as lost revenue and profits; increased repair, labor, replacement part and fuel expenses; lost opportunity; and lost harvests.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d). Diversity jurisdiction exists as Defendant is a citizen of a state other than the state of which Plaintiff is a citizen. Plaintiff seeks more than $75,000, and have a good faith basis to believe that more than $75,000 is at issue in this case. Plaintiff seeks attorneys' fees, direct and indirect pecuniary and monetary damages, and a refund of purchase prices. Module Express pickers sell for as much as $500,000 each. In addition to damages recoverable in any class action currently on file related to the Module Express pickers, Plaintiff seeks more than $75,000 in this action.

9. Venue in this case is proper under 28 U.S.C. § 1391 and 28 U.S.C. § 1441 in the United States Court for the Eastern District of Wisconsin in that a substantial portion of Defendant's conduct which forms the basis of this action occurred in this judicial district. Defendant has its corporate headquarters in this district and the deceptive conduct at issue emanated from this judicial district. Defendant received, and continues to receive, substantial revenue from its unlawful conduct in this judicial district. Defendant is subject to personal jurisdiction in this judicial district at the time this action was commenced and is deemed to reside in this judicial district.

## PARTIES

10. Plaintiff Michael Holder ("Holder") owns and operates a family cotton farm, Mickey Holder Farms, in Gregory, Woodruff County, Arkansas.

11. Holder, both individually and with Mickey Holder Farms ("Holder Farms") has owned and operated multiple Case Module Express cotton harvesters in Gregory, Arkansas.

12. Defendant CNH Industrial America LLC is a foreign corporation with its principle place of business in Racine, Wisconsin. It is a wholly owned subsidiary of CNH Industrial NV, a

Dutch-based capital goods company with annual revenues greater than $25,000,000,000. CNH designs, markets, manufactures and sells the Case Module Express cotton pickers at issue in this case.

13. CNH's corporate offices in Racine, Wisconsin operate as the "nerve center" of its business activities and the full extent of its operations are controlled from this location, including all major marketing, design, and manufacturing decisions relevant to the allegations in this Complaint. The misrepresentations alleged herein were "made" in Wisconsin in that CNH caused them to exist from its corporate headquarters in Racine, Wisconsin. As set out below, CNH has engaged in a company-wide scheme to cause cotton farmers such as John Seely to buy faulty and ineffective pickers through false and misleading statements, and this scheme arose in and was controlled from the CNH headquarters in Racine, Wisconsin.

14. CNH sells and services Module Express pickers through a network of captive dealers over which it exercises a high degree of control. CNH used these dealers to disseminate and reiterate its false statements to farmers, and to set the prices for new and used Module Express pickers. Upon information and belief, CNH transferred used, malfunctioning pickers between captive dealers to sell them to farmers in other geographic locations who were not familiar with the failings of those specific machines, through a contractual "transfer program." CNH closely monitored and controlled its dealers partly through a centralized computer system called the Case Communication Network. CNH sets prices for Module Express pickers sold by dealers through "price lists" which it unilaterally sets and which dealers are contractually required to follow.

15. Cotton farmers often have a close relationship with the salesmen employed as agents of their CNH dealers and rely upon these employees to provide specific recommendations as to equipment suitable for their needs. Generally, a single dealer will dominate a region and

farmers will be highly dependent on that dealer for equipment and repair. Dealers have far greater knowledge of the equipment available. Often, farmers and dealers are located in small communities and have regular interactions. The transactions between CNH, through its dealers and agents, and farmers, including Plaintiff, are not arms-length transactions.

## FACTUAL ALLEGATIONS

16. In 2011, Holder was in the market to replace his cotton picker and bailers and began discussions with his local agricultural equipment dealer, Progressive Tractor & Implement Co. ("Progressive"), about acquiring a new cotton picker and bailer.

17. CNH, acting through its captive dealer, Progressive, made a series of false and misleading statements about the Module Express to Holder. CNH engaged in a comprehensive and wide-ranging marketing scheme for the Module Express.[1]

18. CNH's primary marketing claim for the Module Express -- "One Man, One Machine" – emphasized the specific cost savings, efficiency, and effectiveness of the picker. In its promotional materials, CNH stated:

> "The Case Module Express builds industry compatible modules while it moves down the row. That eliminates both the boll buggy and the module builder. It also eliminates the tractors associated with them, the fuel to run them, and the labor costs that go with all of them. With the Module Express, cotton picking is truly a one man one machine operation, and it can pick more cotton in a day than a 6-row basket picker."[2]

19. CNH further claimed that, by buying the Module Express over a traditional basket picking operation, Holder would be "reducing [his] harvest expenses by more than 25%,"[3] and that

[1] CNH's marketing claims, which were made to Holder through Progressive, are set out in more detail in paragraphs 47, below.
[2] Case IH Module Express 625 promo video, available at: https://www.youtube.com/watch?v=vAWxKA8Ahho

[3] *Id.*

the Module Express would reduce capital and labor, and deliver more cotton faster at harvest time.

20. CNH represented to Holder that the Module Express was superior to competitors' cotton picker / module-builders, was reliable, would harvest consistently, and would work as CNH had advertised. CNH further promised to Holder that, through its dealer, Progressive, CNH would keep Holder's Module Express fully operational during its lifespan.

21. Relying on the representations made by CNH, and in hopes of reducing his harvest expenses and increasing profitability, Holder purchased a CNH Module Express 635 ("2012 635") from Progressive.

22. The 2012 635 bore serial number YCT017809.

23. Holder soon learned that CNH's representations and claims concerning the Module Express were false.

24. The engine powering Holder's Module Express was undersized and would not allow the machine to consistently form properly-packed cotton modules.

25. Holder's Module Express would not operate at all in cold conditions, requiring hours of wasted harvesting time just to "warm up."

26. Holder lost significant amounts of harvest time, and consequently lost cotton revenue, due to the Module Express's consistent failure to operate reliably and consistently as promised by CNH.

27. Despite knowing that the Module Express was fundamentally flawed and suffered from widespread problems that were uniform across its entire production, and in an effort to keep Holder from filing suit, CNH continued to promise Holder that it could repair his Module Express to make it perform as it had promised him.

28. Employees and representatives of CNH and Progressive made repeated trips to

Holder's farm throughout the harvest, purportedly to get the Module Express operating properly and as promised to Holder. CNH was unable to correct the flaws in Holder's Module Express, and the Module Express never performed in a manner consistent with the representations made by CNH.

29. Eventually, after repeated empty promises to repair Holder's Module Express, CNH agreed to accept Holder's defective Module Express on trade for a new Module Express, promising that the "bugs" that had continually plagues his 2012 635 had been addressed and eliminated.

30. In 2017 CNH entered into a trade-in agreement with Holder to take back his 2012 Module Express 635 and sell him a new 2017 Module Express 635 ("2017 635"). The 2017 Module Express 635 CNH sold to Holder bore serial number YHT021820.

31. Despite CNH's continued promises that the 2017 635 was redesigned and free of the problems that plagues his 2012 Module Express; the 2017 635 was unable to consistently form cotton modules; it required excessive maintenance causing significant non-operational downtime; and was essentially irreparable.

32. To keep Holder from pursuing any legal remedies against it, CNH continued to promise Holder that it could repair and fix his 2017 635 such that it would operate as CNH had repeatedly promised him it would in its marketing materials and sales communications. Despite all of CNH's promises to the contrary, Holder finally accepted that the 2017 635 would never work as promised, and was essentially worthless as a means of efficiently harvesting cotton.

33. Unable to efficiently harvest cotton or obtain a fair sale price for his 2017 635, Holder was stuck with an inoperable, unusable piece of agricultural equipment that had been sold to him for hundreds of thousands of dollars.

**CNH's Unlawful and Deceptive Scheme**

34. The problems that Holder experienced with the CNH Module Express pickers are part of a much larger, wide-spread unlawful course of conduct through which CNH marketed and sold faulty pickers to farmers and the public through intentional deceptive conduct.

35. Since the 1940's, cotton has been harvested using three pieces of machinery: a mechanical picker (which collects the cotton off the plants), a boll buggy (which transfers the cotton from the picker to the module builder), and a module builder (which compacts the cotton into large rectangular shapes that maintain structure and can be transferred to the gin for processing). The importance of reliable, effective harvesting equipment in the cotton farming industry cannot be overstated. Cotton can only be harvested during certain weather conditions and during a certain temporal window, usually less than a month long. If cotton is not harvested during these narrow windows, farmers incur immense losses.

36. In the late 1990's, the world's two largest manufacturers of agricultural equipment – CNH and John Deere – separately began development of pickers that purportedly would allow cotton farmers to harvest cotton using a single piece of machinery. This "on-board module-building" type picker would, theoretically, both pick cotton and compact it into a module without the need for a buggy and stand-alone module builder. The cotton industry and cotton farmers considered this to be a potentially revolutionary change; it would represent a leap in efficiency and cost-savings for famers who were increasingly seeing profit shrink in the face of foreign competition.

37. CNH and its subsidiaries had long made cotton pickers, and were locked in a battle with John Deere, the largest manufacturer of agricultural equipment, for a greater share of that market, particularly in the United States. Deere had begun development of its picker-baler years

before CNH, filing for a patent in 1999, two years before CNH sought a patent for its on-board module-building picker.[4] But CNH looked to reap enormous gains if it could beat Deere to market with its new on-board module building picker.

38. Upon information and belief, at the time it began to bring its first onboard module-building picker to market, CNH knew that its new picker's design and manufacture suffered from inherent flaws, inadequate quality and process control, insufficient testing and troubleshooting, and manufacturing failures, such that its Module Express picker would never operate correctly. CNH also knew that attempting to resolve these problems prior to releasing the picker would require fundamental changes and significant delay. Delay of that magnitude would erase CNH's competitive advantage from beating Deere to market, and allow Deere to dominate the market before CNH could introduce its new picker. And so, upon information and belief, CNH made a financial decision to push its picker to market first, although the picker it would market and sell was irreparably flawed.

39. In October 2006, CNH introduced its new picker, the Case Module Express 625. The Module Express, as represented, was designed to pick cotton at more than three miles per hour, while at the same time forming the picked cotton into a rectangular module that could be deposited in the field. The rectangular module it was to create was 8 feet by 8 feet by 16 feet, half the size of a traditional cotton module, and up to 10,000 pounds in weight. Purportedly, a new auger system and software in the module building section of Module Express would pack the cotton such that it would hold together when deposited in the field, allowing the module to be manually covered with a tarp and later transferred to the gin. This would allow cotton famers to

[4] Notably, CNH appears to have since let its 2001 patent for the Module Express packing system lapse, and has rather filed patents for alternative packing systems; essentially recognizing that the system it sold to farmers as workable is untenable.

trade in their current picker, buggy, and module builder for a single piece of equipment which would accomplish all three tasks more quickly, more efficiently, and with less labor and operating costs than previously.

40. CNH priced the Module Express at nearly $500,000. This is far more expensive than a traditional picker, and CNH priced it with the intent of capturing much of the purported cost savings CNH promised farmers they would see through the "revolutionary" Module Express. In approximately 2012, CNH changed the model number of the Module Express to 635. Upon information and belief, CNH implemented the model number change, not as a legitimate delineation between substantively different pickers, but as part of CNH's larger scheme to control fallout from the faulty 625 designation through rebranding, much like when Ford Motor Company sold rebranded Pintos as Bobcats in the mid-to-late 1970s. CNH used the rebranding to convince farmers to buy a "new" 635 picker that purportedly would not have the same flaws.

41. As discussed below, the CNH carried out a consistent scheme to deceptively market and sell the Module Express. CNH made specific, factual representations that were wholly untrue with the intent and effect of inducing farmers to purchase Module Express pickers. The Module Express is hugely flawed; a result of deep-set manufacturing failures and defective design, that CNH rushed to market and sold to unsuspecting farmers knowing that it would never operate as promised. CNH sold these pickers based upon misrepresentations, then falsely assured farmers that "patches" and fixes were coming that would fix the unfixable machine. CNH knew that it would not provide the parts, manuals, and service necessary for farmers to maintain and repair the pickers while representing otherwise. When farmers would trade in their Module Express pickers (often as the result of false statements that the "new" pickers were substantially different and would not suffer from the same flaws), CNH would take those inoperable machines, and resell them to

other unsuspecting farmers at huge markups based upon false statements that these used pickers were operable.

42. Thus, farmers who CNH induced to buy a Module Express, with promises of huge gains in efficiency and cost savings, have been left with a what, as one farmer put it, ultimately is a "400,000 dollar bird nest."

## I. CNH Issued Materially False Statements Emanating From Wisconsin To Sell Defective Pickers.

43. CNH has consistently made statements regarding the Module Express pickers which are untrue, deceptive and misleading, with the intent and effect of inducing farmers into buying an incredibly expensive—and important—piece of equipment that would not operate as promised and which would be worth far less than it should be after purchase.

44. CNH engaged in its marketing scheme through a coordinated, centralized effort in its headquarters in Racine, Wisconsin. CNH executives located there determined how to market and represent the Module Express, and disseminated those materials to the public, often through press filings and uniform marketing documents distributed to captive dealers (and in turn to the public) that sold CNH equipment. All representations alleged herein were "made" in Wisconsin in that they were caused to exist form CNH's headquarters in Racine, Wisconsin.

45. Although CNH used multiple avenues to disseminate false, misleading, and deceptive representations, the singular narrative thread among all representations was that the Module Express was a reliable machine that was powerful and could operate in all conditions, that it would both pick cotton and build consistent, well-formed cotton modules, and that it was the most efficient and profitable way to harvest cotton. None of this was true.

46. CNH began its deceptive marketing scheme to the public in 2006, with an unveiling of the Module Express at a circus tent it erected in Mississippi, and continued it throughout the

production and sale of the Module Express to the present.

47. Among the deceptive representations made by CNH in public statements, including in marketing brochures, press releases, statements on CNH's website, and form statement by CNH dealers, were the following:

**Specific Representations That The Module Express Was Designed And Constructed With Sufficient Power To Accomplish Specific Tasks In Diverse Conditions**

- that the "Module Express harvests just as effectively on wet or dry ground" [5]

- that the Module Express has "the power to pick in the toughest conditions" [6]

- that the Module Express is "powerful, pulling through wet, uneven soil with no trouble at all"[7]

- that the Module Express "has the power to handle picking in the toughest conditions…" [8]

- that the Module Express "can harvest in difficult conditions as easily as it does on dry land." [9] [10]

---

[5] *See* July 11, 2007 CNH public press release, available at http://www.marketwired.com/press-release/cutting-edge-cotton-harvester-rolls-off-the-line-nyse-cnh-750508.htm.

[6] 2009 CNH website, available at https://web.archive.org/web/20081115050612/http://www.caseih.com/products/series.aspx?seriesid=2880&navid=105&RL=ENNA

[7] Module Express Brochure, 2011-2018.

[8] *See* June 21, 2007 CNH public press release, available at https://www.farmprogress.com/cases-new-board-module-builder-technology.

[9] 2015 CNH website, available at https://web.archive.org/web/20151021060133/http://www.caseih.com/northamerica/en-us/products/harvesting/module-express-cotton-pickers

[10] 2017 and 2018 CNH website, available at https://www.caseih.com/northamerica/en-us/products/harvesting/module-express-cotton-pickers

**Specific Representations That The Module Express Is More Efficient And Profitable Than Traditional Equipment**

- that the "[c]ost savings with the Module Express total 25% compared with traditional cotton harvesting methods…" [11]

- that "when it comes to cost per acre, nothing beats a Module Express" and the Module Express "offers unequaled cost-per-acre savings" [12]

- that the Module Express will "[m]aximize your ROI with industry-leading picking efficiency" [13]

- that the Module Express is the "most efficient cotton-harvesting package available" [14]

- that the Module Express is the "most profitable" way to harvest cotton. [15]

- that the Module Express "picks cotton at maximum efficiency…dramatically reducing a cotton producer's equipment and labor investment while streamlining the harvest process." [16] [17] [18]

**Specific Representations That The Module Express Would Produce Consistent, Well-Formed, Weatherable Cotton Modules**

---

[11] *See* July 11, 2007 CNH public press release, available at http://www.marketwired.com/press-release/cutting-edge-cotton-harvester-rolls-off-the-line-nyse-cnh-750508.htm.

[12] Module Express Brochure, 2011-2018.

[13] *See* June 21, 2007 CNH public press release, available at https://www.farmprogress.com /cases-new-board-module-builder-technology.

[14] *See* June 21, 2007 CNH public press release, available at https://www.farmprogress.com/cases-new-board-module-builder-technology.

[15] Module Express Brochure, 2011-2018.

[16] 2009 CNH website, available at https://web.archive.org/web/20081115050612/http://www.caseih.com/products/series.aspx?seriesid=2880&navid=105&RL=ENNA

[17] 2015 CNH website, available at https://web.archive.org/web/20151021060133/http://www.caseih.com/northamerica/en-us/products/harvesting/module-express-cotton-pickers

[18] 2017 and 2018 CNH website, available at https://www.caseih.com/northamerica/en-us/products/harvesting/module-express-cotton-pickers

- that the Module Express will create "consistent domed [rectangular] modules for excellent weatherability and ginning" [19] [20] [21]

- that the Module Express packing system is "fine-tuned to create consistent, domed modules for excellent weatherability and ginning" [22]

- that the Module Express will create "consistent domed modules for excellent weatherability" [23]

**Specific Representations That The Module Express Does Not Require More Maintenance That Traditional Equipment, Was Well-Built, And Reliable**

- that the "productivity gains don't add maintenance" and the Module Express "requires less maintenance than a traditional basket picker" [24]

- that the Module Express "requires less daily maintenance than a traditional basket picker" [25] [26]

- that the Module Express packing system "is proven to work year after year."

---

[19] 2009 CNH website, available at https://web.archive.org/web/20081115050612/http://www.caseih.com/products/series.aspx?seriesid=2880&navid=105&RL=ENNA .

[20] 2015 CNH website, available at https://web.archive.org/web/20151021060133/http://www.caseih.com/northamerica/en-us/products/harvesting/module-express-cotton-pickers

[21] 2017 and 2018 CNH website, available at https://www.caseih.com/northamerica/en-us/products/harvesting/module-express-cotton-pickers

[22] *See* June 21, 2007 CNH public press release, available at https://www.farmprogress.com/cases-new-board-module-builder-technology.

[23] Module Express Brochure, 2006-2011.

[24] *See* July 11, 2007 CNH public press release, available at http://www.marketwired.com/press-release/cutting-edge-cotton-harvester-rolls-off-the-line-nyse-cnh-750508.htm.

[25] 2015 CNH website, available at https://web.archive.org/web/20151021060133/http://www.caseih.com/northamerica/en-us/products/harvesting/module-express-cotton-pickers

[26] 2017 and 2018 CNH website, available at https://www.caseih.com/northamerica/en-us/products/harvesting/module-express-cotton-pickers

- that the Module Express build and design allows for a "quicker start in harvest season" and allows farmers "to finish earlier in the season." [27]

48. Notably, CNH's representations were specific and meaningful, designed to induce Plaintiff to purchase the faulty Module Express pickers. These were not representations of opinion on a matter of judgment or puffery—*e.g.* that the Case picker was the "smarter choice" or the "best"—but rather representations of fact that may be objectively proven as false and which Plaintiff will prove as false. These representations have specific meanings within the cotton industry. Industry usage and context confirms that CNH's representations in selling the Module Express are measurable, quantifiable metrics which can be proven false.

49. Additionally, CNH failed to disclose material facts that it was under a duty to disclose to Plaintiff. [28] Among these omissions was the failure to disclose that the Module Express was a product of unresolved design flaws and a faulty manufacturing process, that the Module Express power, compacting, and software systems were not sufficient to create consistent, weatherable modules or to operate in varied terrain or weather environments, that the Module Express was not sufficiently reliable to be a sole method of harvesting cotton, and that the cost to own and operate the Module Express was far greater than alternatives.

50. These specific representations made by CNH from its Wisconsin headquarters to the public, including Plaintiff, were false, deceptive, and misleading. The Module Express pickers that Plaintiff purchased failed to operate as CNH promised. They failed and broke down in the

[27] Module Express Brochure, 2011-2018.

[28] Omissions are not in themselves actionable under the WDTPA, but they are relevant to such claims. Plaintiff's WDTPA claim is not based upon omissions, but as to specific misrepresentations made to the public that will be proven to be false. The omissions are relevant in this determination as recognized by precedential law, as well as to Plaintiff's common law claims.

field quickly and often, needed continual repairs, and were not reliable enough such that Plaintiff can use them throughout a cotton harvest. The Module Express pickers did not have sufficient power to pick cotton in diverse terrain or weather; they broke down, bogged down, and elements related to the hydraulic system failed or got stuck. The module packing systems failed to create consistent, domed, rectangular modules that will hold together and be weatherable. The Module Express pickers did not save Plaintiff time or money, particularly when the precipitous loss of value of the machines is taken into account. Nor were they the most efficient or cost-effective method of harvesting cotton; Plaintiff routinely was forced to borrow, lease, or buy alternative means of harvesting cotton during a harvest simply to protect his investment in the field. The cost-per-acre of using a Module Express pickers were much higher than using comparable equipment from other manufacturers (or even using non-module building pickers). CNH sold the Module Express to Plaintiff as a "revolutionary" picker that was powerful and reliable, and which would save Plaintiff time and money and lead to a greater return on their investment. This was untrue, deceptive, and, upon information and belief, CNH knew it to be so, but acted intentionally and aggressively to continue to sell the high-priced Module Express pickers to unsuspecting farmers, including Plaintiff, and to falsely claim that previous problems had been remedied.

**A. The Module Express Pickers Have Significant Design And Manufacturing Defects.**

51. The Module Express pickers have significant design and manufacturing failures. CNH, upon information and belief following investigation, pushed the Module Express to market knowing that it had significant design flaws, particularly in the hydraulic, power, and module forming components. Such flaws manifest themselves often in a lack of sufficient power to operate in diverse terrain and weather conditions and lead to consistent eventual failures and break-downs in the Module Express pickers. CNH attempted to remedy some of these issues through multiple

software patches, but was unable to do so.

52. Further, CNH experienced continual and widespread manufacturing failures at the plant in which the Module Express pickers are made. All Module Express pickers in the United States were manufactured at a plant CNH owns and operates in Benson, Wisconsin. From the beginning of the Module Express production, and consistently to this day, the Benson plant has had widespread problems with the manufacturing, workmanship, and assembly of Module Express pickers that caused the pickers to be faulty and to break down quickly and continually in the field. Upon information and belief, CNH was well-aware of the problems with implementing and controlling an effective manufacturing processes for the Module Express and repeatedly changed management at the Benson plant to try to correct them, but was unable to correct the design and manufacturing flaws that persist to this day with the Module Express pickers.

## II. CNH Misrepresented Module Express Pickers That Had Proven To Be Inoperable As Functional Pickers And Resold Them.

53. CNH engaged in a separate unlawful scheme by which it resold non-functioning, previously owned Module Express pickers to unsuspecting farmers as operable machines. CNH controls the resale market for Module Express pickers through its captive dealers. Often, the CNH dealers are the only avenue for farmers that purchased these pickers to attempt to regain some of their losses, either by trading in for new Module Express pickers (that CNH falsely represents as not suffering from the same flaws) or for other cotton harvesting machinery. When CNH does buy back Module Express pickers through trade-ins, it does so at hugely depressed values from farmers who have little to no alternative.

54. These previously owned pickers invariably suffer from the same repeated and irreparable defects in design and manufacturing that caused their prior owners to get rid of them. They did not operate as promised or required for the original owners, a fact of which CNH is well

aware given the repair orders and claims made by dealers which CNH tracks by picker serial number through a centralized system.

55. Despite knowing that these specific previously owned Module Express pickers suffered from such failings that they could not operate to pick and bale cotton, CNH takes them from one dealer, moves them to a dealer located in another part of the country, and they represent them to purchasers as operable, in good working order, and capable of picking and baling cotton. These representations are false. CNH does not reveal to farmers which purchase used machines that they have been subject to multiple repair claims, that CNH has not been able to adequately fix them, and that they do not operate as represented.

56. At the time Holder purchased his Module Express 635s from a CNH dealer, CNH's dealer represented that the machines were in good working order and would perform as represented by CNH's promotional claims. Upon information and belief, the pickers CNH sold to Holder had experienced significant and extensive performance and operational issues prior to CNH repackaging and reselling them as operable, working pickers to Holder.

## III. CNH Failed To Provide Parts, Manuals, And Support.

57. Additionally, CNH, based upon investigation, information, and belief, failed to make and supply sufficient replacement and repair parts, manuals, and support for the Module Express pickers. CNH represented to purchasers that the Module Express pickers could be maintained and would remain operational throughout a typical lifespan. As is customary in the industry, and as CNH knows, it is crucial that cotton harvesting equipment be operational during the window necessary to harvest cotton.

58. CNH, through mismanagement, an attempt to limit its back-end costs for failing pickers, or, most likely, a hidden abandonment of the Module Express it still manufactured and

sold, did not acquire or manufacture sufficient amounts of crucial replacement parts for the Module Express pickers from at least 2012 through the present. The result was that when, inevitably, Module Express pickers broke down, farmers could not get them repaired quickly enough. This is particularly problematic for cotton farming, where harvesting is weather and time sensitive and farmers often have as few as 20 days a year to bring in their cotton crop. CNH knew that it was unable to supply sufficient volumes of replacement parts to keep its Module Express machines operating, but continued to sell Module Express pickers without disclosing this material fact. Plaintiff was directly harmed as a result. CNH's conduct was unlawful, deceptive, and unfair.

## TOLLING AND ACRRUAL OF THE APPLICABLE STATUTUES OF LIMITATION

59. **Equitable Tolling:** Plaintiff, despite all due diligence, could not obtain vital information relevant to the existence of the claims brought in this lawsuit, as set out herein. Plaintiff did not know, and reasonable persons could not know, that the faults in the Module Express could possibly be due to CNH's wrongful and intentionally wrongful conduct. Plaintiff reasonably serviced, repaired, and maintained their Module Express picker(s). Also as alleged above, Plaintiff was assured by CNH that the problems they were experiencing were not widespread or a result of design and manufacturing flaws. Plaintiff could not have discovered, through the use of reasonable diligence, that CNH's conduct was unlawful and actionable within the time period of any applicable statutes of limitation. Nor could they have determined with the exercise of any reasonable diligence that the value of the Module Express would decrease precipitously, that CNH would not provide the parts and support necessary to maintain the Module Express pickers, or that CNH would intentionally depress the resale value of the Module Express pickers.

60. **Equitable Estoppel/Fraudulent Concealment:** Throughout the relevant time

period, CNH actively concealed the wrongful conduct at issue in this case, failed to disclose to Plaintiff material information concerning the defective design and manufacture of the Module Express pickers, the inadequate service and lack of replacement parts available to repair the Module Express pickers, and CNH's actions with regard to suppress the resale value of the Module Express pickers. CNH acted knowingly and intentionally to ensure that Plaintiff could not discover the nature and extent of the conduct giving rise to the claims brought herein including by making false representations as to the nature and source of the problems with the Module Express pickers. As a result, Plaintiff could not have discovered his claims, the issues with the Module Express pickers, or the conduct of CNH at issue in this litigation through the use of reasonable efforts or reasonable diligence.

61. CNH engaged in a scheme of wrongful conduct that is ongoing. CNH continues to claim to Plaintiff and other purchasers of the flawed Module Express that the Module Express can be repaired and perform as promised by CNH.

## FIRST CLAIM FOR RELIEF
## Violation of the Wisconsin Deceptive Trade Practices Act

62. All allegations and paragraphs in this complaint are incorporated by reference into this claim.

63. CNH is a "person, firm, corporation or association" as defined by Wisconsin Statutes § 100.18(1).

64. Plaintiff is a member of "the public" as defined by Wisconsin Statutes § 100.18(1).

65. With the intent to sell, distribute, or increase consumption of merchandise, services, or anything else offered by CNH to members of the public, CNH made, published, circulated, and placed before the public-or caused (directly or indirectly) to be made, published, circulated, placed before the public-advertisements, announcements, statements, and representations which

contained assertions, representations, or statements of fact which are untrue, deceptive, and misleading.

66. CNH also engaged in such untrue, deceptive, and misleading conduct as part of a plan or scheme the purpose or effect of which was not to sell merchandise as advertised.

67. Among the untrue, deceptive, and misleading statements made by CNH to the public with the intent to induce an obligation—specifically the purchase of a Module Express cotton picker—are set about above, including that the Module Express pickers are efficient, cost effective, powerful and can operate in difficult conditions, will produce consistent well-formed modules, require less maintenance than basket pickers, and reliable.

68. CNH makes these representations consistently in marketing materials, advertisements, and in newspaper articles.

69. These representations are not expressions of opinion, they are specific factual statements.

70. As set out above, the representations and scheme CNH enacted through them emanated from Wisconsin. CNH controls all marketing, manufacturing, and selling of the Module Express pickers from its corporate headquarters in Racine, Wisconsin. The representations at issue here were "made" in Wisconsin in that CNH "caused them to exist" from Wisconsin, and they were part of a nation-wide scheme whereby they were disseminated from Wisconsin across the country. Each representation at issue here was made before the parties entered into a contractual relationship to purchase the respective Module Express pickers which is the source of pecuniary loss for Plaintiff.

71. The representations are untrue, deceptive and misleading, as discussed above, because CNH acted knowingly and intentionally with the purpose of causing and inducing Plaintiff

to purchase Module Express pickers which CNH knew to be faulty, defective, and which would not operate as promised, and which CNH knew it would not adequately provide service and parts for future repair, and which CNH knew it would artificially depress re-purchase and trade in values for in the future.

72. The representations caused a pecuniary loss to Plaintiff, who incurred damages as a direct result thereof. Through its conduct, CNH intended to—and in fact did—materially induce Plaintiff to purchase or lease a Module Express picker which directly and proximately resulted in pecuniary losses, including not receiving the benefit of the bargain in purchasing the Module Express pickers, incurring transactional costs, purchasing equipment which lost value precipitously and was not re-sellable, losing time and money through inoperable equipment, incurring monetary costs associated with faulty equipment during harvest, and purchasing equipment for which CNH knowingly would not provide viable repair parts or services.

73. Plaintiff has been damaged by CNH's conduct including through diminution of value of the Module Express pickers, costs of repair and replacement, lost crops, increased crop processing costs, loss of use of the Module Express pickers, additional labor costs incurred, and other damages.

## SECOND CLAIM FOR RELIEF
**Breach of Implied Warranty of Merchantability**

74. All allegations and paragraphs in this complaint are incorporated by reference into this claim.

75. CNH sold goods, specifically the Module Express pickers, to Plaintiff. CNH is in the business of manufacturing and selling such goods and does so regularly.

76. These goods were not merchantable at the time of sale. They were not fit for the ordinary purpose for which such goods are used, specifically for harvesting cotton and forming it

into modules.  Nor were they of average quality, as set out above.

77.    CNH has actual knowledge of the particular defects at issue in this case through internal communications and reports (tracking complaints from dealers detailing flaws in the Module Express pickers), direct complaints from customers and the public, and internal testing. CNH, at the corporate executive level, from its Racine, Wisconsin headquarters, is in constant contact with its highly-controlled dealers, both in the United States, and in other parts of the world in which cotton is produced and CNH sells pickers (South America, for example). CNH monitors cotton harvests and the operation of its pickers in such harvests and was continually aware of the defects in the Module Express pickers.  CNH received notice of the defects through complaints received by, and repairs conducted by, their controlled dealers, who were aware of the defects in the Module Express pickers and reported such defects to CNH.  Additionally, CNH has received actual notice through other lawsuits which address such defects.

78.    Furthermore, CNH has and has had actual knowledge of the defects at issue through communications received directly from Plaintiff. Plaintiff has, on numerous occasions, notified his local CNH dealer of the many repeated failures of the Module Express to operate reliably and as promised by CNH. CNH has dispatched corporate service technicians from its headquarters in Racine, Wisconsin to attempt to repair some of the malfunctions Plaintiff experienced. Accordingly, CNH has had ample and extensive notice of the defects Plaintiff experienced with his Module Express.

79.    Plaintiff has been damaged by CNH's breach of the implied warranty of merchantability through purchasing and owning Module Express pickers that do not operate as represented, were not fit for the purpose they were sold, including through diminution of value of the Module Express pickers, costs of repair and replacement, lost crops, increased crop processing

costs, loss of use of the Module Express pickers, additional labor costs incurred, and other damages.

**Any Attempt By CNH To Limit Or Waive Remedies Is Without Effect.**

80. Any attempt by CNH to limit or waive the implied warranty of merchantability is ineffective for two reasons. First, any express warranty that fails in its essential purpose is invalid. CNH, given ample opportunity, repeatedly failed to adequately repair Module Express pickers, which did not subsequently operate as equipment free of defects should operate. Any express warranty remedies do not provide a fair quantum of remedy, as CNH could not, and would not, and to this day cannot adequately repair or replace failing Module Express pickers, effectively depriving Plaintiff of the benefit of the bargain. Therefore, any purported limitations of remedies or waiver of implied warranties in any express warranty are invalid.

81. Second, CNH cannot limit or waive the warranty of merchantability as any such attempts were made after contracting. When Plaintiff purchased Module Express pickers through CNH dealers, they agreed to do so through initial documents which do not contain waivers and limitations. The existence of any warranty limitations was not disclosed to Plaintiff at the time of sale. Since the warranty that purported to limit or waive remedies or warranties and was subsequently provided after the agreement to purchase and sell is already made, and was not signed, it is without legal effect.

## THIRD CLAIM FOR RELIEF
## Breach of the Duty of Good Faith and Fair Dealing

82. All allegations and paragraphs in this complaint are incorporated by reference into this claim.

83. CNH entered into contracts with Plaintiff for the sale of Module Express pickers.

84. Inherent in every contract is the implied promise of good faith and fair dealing.

85. CNH breached the duty of good faith and fair dealing through the conduct set out above, including by misrepresenting and failing to disclose the nature and quality of the pickers sold, by failing to adequately supply parts and support for necessary repairs, and by manipulating the buy-back and resale market for used pickers.

86. Such conduct was objectively unreasonable and evaded the spirit of the bargain between CNH and Plaintiff.

87. As a result of CNH's misconduct and breach of good faith and fair dealing, Plaintiff did not receive the benefit of the bargain for which they contracted and has been otherwise damaged, including through diminution of value of the Module Express pickers, costs of repair and replacement, lost crops, increased crop processing costs, loss of use of the Module Express pickers, additional labor costs incurred, and other damages.

## FOURTH CLAIM FOR RELIEF
**Unjust Enrichment**

88. All allegations and paragraphs in this complaint are incorporated by reference into this claim.

89. To the extent necessary, this count is pled in the alternative to the other counts.

90. CNH received money from Plaintiff which in justice and equity it should not be permitted to keep. The benefit conferred by Plaintiff was non-gratuitous, CNH realized value from this benefit, and CNH has knowledge of that benefit. It would be inequitable for CNH to retain this benefit without payment of the value to Plaintiff.

## FIFTH CLAIM FOR RELIEF
**Fraud**

91. All allegations and paragraphs in this complaint are incorporated by reference into this claim.

92. The elements of common law fraud include the following: 1) the defendant made a representation of fact to the plaintiff; 2) the representation of fact was false; 3) the plaintiff believed and relied on the misrepresentation to her detriment or damage; 4) the defendant made the misrepresentation with knowledge that it was false or recklessly without caring whether it was true or false; and 5) the defendant made the misrepresentation with intent to deceive and to induce the Plaintiff to act on it to her detriment or damage. *Tietsworth v. Harley-Davidson, Inc.*, 270 Wis. 2d 146, 157, 677 N.W.2d 233, (Wis. 2004); *citing Ollerman v. O'Rourke Co., Inc.*, 94 Wis. 2d 17, 26, 288 N.W.2d 95 (Wis. 1980).

93. CNH made false representations of fact to Plaintiff, as set out above, including that the Module Express pickers are efficient, cost effective, powerful and can operate in difficult conditions, will produce consistent well-formed modules, require less maintenance than basket pickers, and reliable. CNH made such false representations in brochures, through agents, and otherwise to Plaintiff.

94. CNH made material omissions of fact to Plaintiff, as set out above, including by failing to disclose that the Module Express Pickers suffered from significant design and manufacture flaws such that they did not have sufficient operational power to operate in adverse geographic or weather conditions, would not consistently form domed, weatherable bales, would continually break down and require more maintenance that traditional pickers, would operate less efficiently and require greater repair and operation costs than traditional pickers, and would lose value more quickly than they otherwise should have.

95. CNH knew that these affirmations of fact are false, knew them to be false when made, or made such misrepresentations recklessly.

96. CNH made such misrepresentations with the intent to deceive and induce Plaintiff

to purchase Module Express Pickers.

97. Plaintiff believed and relied on CNH's fraudulent representations and omissions and as a direct and proximate pecuniary damages as a result.

98. Plaintiff has suffered pecuniary and such other and further damages, including through diminution of value of the Module Express pickers, costs of repair and replacement, lost crops, increased crop processing costs, loss of use of the Module Express pickers, additional labor costs incurred, and other damages.

## SIXTH CLAIM FOR RELIEF
## Negligent Misrepresentation

99. All allegations and paragraphs in this complaint are incorporated by reference into this claim.

100. This claim is brought in the alternative to the Fifth Claim for Relief.

101. CNH made representations of fact, as set out above, to Plaintiff and the public.

102. These representations are untrue and false, and CNH was negligent in making such representations as they knew or should have known that they were false.

103. Plaintiff relied on CNH's misstatements of fact and was damaged as a direct and proximate cause thereof, including through diminution of value of the Module Express pickers, costs of repair and replacement, lost crops, increased crop processing costs, loss of use of the Module Express pickers, additional labor costs incurred, and other damages.

## PRAYER FOR RELIEF

Plaintiff seeks:

(1) all damages not recoverable or recovered through class adjudication, including but not limited to direct and indirect pecuniary loss, consequential damages, and a refund of purchase prices;

(2)     reasonable attorney's fees and costs;

(3)     injunctive relief;

(4)     full restitution of all amounts paid to Defendant;

(5)     punitive damages, and

(6)     all other relief which the Court or jury should find appropriate.


**Plaintiff demands a trial of all claims by struck jury.**


Dated: August 19, 2019                    Respectfully submitted,

                                          /s/ John Rainwater
                                          John Rainwater (Arkansas Bar No. 2009137)
                                          Robert L. Beard (Arkansas Bar No. 2002109)
                                          **RAINWATER, HOLT & SEXTON, P.A.**
                                          P.O. Box 17250
                                          Little Rock, AR  72222
                                          (501) 868-2500
                                          (501) 868-2508 (fax)


                                          /s/ John D. Blythin
                                          Shpetim Ademi (SBN 1026973)
                                          John D. Blythin (SBN 1046105)
                                          Mark A. Eldridge (SBN 1089944)
                                          **ADEMI & O'REILLY, LLP**
                                          3620 East Layton Ave Cudahy, WI 53110
                                          (414) 482-8000
                                          (414) 482-8001 (fax)
                                          sademi@ademilaw.com
                                          jblythin@ademilaw.com
                                          meldridge@ademilaw.com