**IN THE UNITED STATES COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**

**MICHAEL HOLDER**

**Plaintiff,**

**v.**

**CNH INDUSTRIAL AMERICA, LLC**

**Defendant.**

**Case No.: 2:19-cv-1194-LA**

**Hon. Lynn Adelman**

## FIRST AMENDED COMPLAINT

Plaintiff Michael Holder ("Holder") files this amended complaint against CNH Industrial America, LLC ("CNH Industrial"). In support thereof, Plaintiff states the following:

## INTRODUCTION

1.     CNH Industrial is the American subsidiary of a global Dutch conglomerate that manufacturers agricultural equipment. For years, CNH Industrial has been inducing farmers in the United States, including Plaintiff, to purchase fundamentally flawed Module Express cotton pickers through a coordinated scheme of deceptive, unfair, and unlawful conduct.

2.     The Module Express was purported to represent a revolution in cotton harvesting: a single piece of equipment that could both pick cotton and pack it into modules. But CNH Industrial rushed its picker to market, intent on beating John Deere (which was also designing a picker-baler) and increasing its share of the American cotton market. CNH Industrial knew that its Module Express pickers suffered from fundamental design defects—including problems with the power, hydraulic, module packing, and software systems—and continual, crippling manufacturing process failures, and that this incredibly expensive piece of farm equipment would never function correctly.

3.     Despite this knowledge, CNH Industrial carried out a methodical scheme to falsely represent specific characteristics of the Module Express with the intent and effect of inducing unsuspecting farmers into buying them. After farmers purchase a Module Express picker (and invariably face repeated mechanical failures) CNH Industrial deliberately misrepresents the nature of the problem as fixable and isolated, causing farmers to keep their pickers, trade in for "new model" pickers, and not realize their legal claims.

4.     CNH Industrial buys back previously-sold Module Express pickers that have proven to be effectively useless from farmers at hugely deflated values. It then takes these pickers—which it knows cannot successfully operate to pick and bale cotton—and re-sells them to other farmers. All the while, CNH Industrial makes the same misrepresentations regarding the features and functionality of these used pickers that it does for new pickers.

5.     Once farmers own these defective Module Express Pickers, they invariably break down and fail to operate as represented or reasonably expected.

6.     Through its deliberate, pernicious conduct CNH Industrial has caused millions of dollars of harm to cotton farmers who often cannot absorb such losses without catastrophic effects to their livelihoods.

7.     Plaintiff is among the many farmers who have been harmed through CNH Industrial's conduct, and has incurred individual damages, including consequential damages (such as lost revenue and profits; increased repair, labor, replacement part and fuel expenses; lost opportunity; and lost harvests).

**JURISDICTION AND VENUE**

8.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a). Plaintiff is citizen of Arkansas. CNH Industrial is a Delaware company with its principal place of

business in Wisconsin. Its sole member is Case New Holland Industrial, Inc., a Delaware corporation with its principal place of business in Wisconsin. Thus, CNH Industrial is a citizen of Delaware and Wisconsin. The amount in controversy exceeds $75,000, exclusive of interest and costs. Plaintiff seeks more than $75,000, and have a good faith basis to believe that more than $75,000 is at issue in this case. Plaintiff seeks attorneys' fees, direct and indirect pecuniary and monetary damages, and a refund of purchase prices. Module Express pickers sell for as much as $500,000 each. In addition to damages recoverable in any class action currently on file related to the Module Express pickers, Plaintiff seeks more than $75,000 in this action.

9.      Venue in this case is proper under 28 U.S.C. § 1391 and 28 U.S.C. § 1441 in the United States Court for the Eastern District of Wisconsin in that a substantial portion of Defendant's conduct which forms the basis of this action occurred in this judicial district. Defendant has its corporate headquarters in this district and the deceptive conduct at issue emanated from this judicial district. Defendant received, and continues to receive, substantial revenue from its unlawful conduct in this judicial district. Defendant is subject to personal jurisdiction in this judicial district at the time this action was commenced and is deemed to reside in this judicial district.

## PARTIES

10.      Plaintiff Michael Holder ("Holder") owns and operates a family cotton farm, Mickey Holder Farms, in Gregory, Woodruff County, Arkansas. Holder has owned and operated multiple Case Module Express cotton harvesters in Gregory, Arkansas.

11.      Defendant CNH Industrial America LLC is a Delaware entity with its principal place of business in Racine, Wisconsin. It is a wholly owned subsidiary of CNH Industrial NV, a Dutch-based capital goods company with annual revenues greater than $25,000,000,000. CNH

Industrial designs, markets, manufactures and sells the Case Module Express cotton pickers at issue in this case. CNH Industrial NV has a number of other American subsidiaries, including CNH Industrial Capital. These subsidiaries are created solely as a shield from potential liability. The American subsidiaries of CNH Industrial NV, including CNH Industrial America, LLC and CNH Industrial Capital, operate in concert and essentially as one entity, sharing ownership and leadership. CNH Industrial America, LLC and CNH Industrial Capital are alter egos of each other.

12.     CNH Industrial's corporate offices in Racine, Wisconsin operate as the "nerve center" of its business activities and the full extent of its operations are controlled from this location, including all major marketing, design, and manufacturing decisions relevant to the allegations in this Complaint.  The misrepresentations alleged herein were "made" in Wisconsin in that CNH Industrial caused them to exist from its corporate headquarters in Racine, Wisconsin. As set out below, CNH Industrial has engaged in a company-wide scheme to cause cotton farmers to buy faulty and ineffective pickers through false and misleading statements, and this scheme arose in and was controlled from the CNH Industrial's headquarters in Racine, Wisconsin even if the statements appeared or were seen elsewhere.  Under precedential law, Wisconsin common law and the Wisconsin Deceptive Trade Practices Act, Wisconsin Statutes § 100.18 *et seq.*, apply to the claims of Plaintiff.

13.     CNH Industrial sells and services new and used Module Express pickers through a complicated transactional structure involving itself, its sister entity CNH Industrial Capital, and its network of heavily-controlled dealers. CNH Industrial used these dealers to disseminate and reiterate its uniform false statements to farmers, to set the prices for new and used Module Express pickers, and to—itself—play an indispensable role as a party in the sale of new and used pickers to farmers. CNH Industrial closely monitored and controlled its dealers partly through a centralized

computer system called the Case Communication Network.

**FACTUAL ALLEGATIONS**

**The Cotton Industry and Development of the Module Express**

14.     This litigation involves cotton pickers that CNH Industrial designed, manufactured, marketed, and sold as the Case Module Express (the "Module Express" pickers).

15.     Historically, cotton has been harvested using three pieces of machinery: a mechanical picker (which collects the cotton off the plants), a boll buggy (which transfers the cotton from the picker to the module builder), and a module builder (which compacts the cotton into large rectangular shapes that maintain structure and can be transferred to a gin for processing). The importance of reliable, effective harvesting equipment in the cotton farming industry cannot be overstated.  Cotton can only be harvested during certain weather conditions and during a certain temporal window, usually less than a month long.  If cotton is not harvested during these narrow time frames, farmers often incur immense losses. Because of this narrow window, cotton harvesting equipment must not only be reliable, efficiency and reliability are paramount.

16.     In the late 1990's, the world's two largest manufacturers of agricultural equipment– CNH Industrial (frequently and colloquially known as "Case IH") and John Deere–separately began development of pickers that purportedly would allow cotton farmers to harvest cotton using a single piece of machinery.  This "on-board module-building" type picker would, theoretically, both pick cotton and compact it into a module without the need for a buggy and stand-alone module builder.  The cotton industry considered this to be a potentially revolutionary change; it would represent a leap in efficiency and cost-savings for famers who were increasingly seeing profit shrink in the face of foreign competition.

17.     CNH Industrial is a wholly owned subsidiary of CNH Industrial NV, a giant Dutch-

5

based capital goods company that has annual revenues greater than $25,000,000,000. CNH Industrial had long made cotton pickers and was locked in a battle with John Deere, the largest manufacturer of agricultural equipment, for a greater share of that market, particularly in the United States. Deere had begun development of its picker-baler years before CNH Industrial, filing for a patent in 1999, two years before CNH Industrial sought a patent for its on-board module-building picker.[1] But the potential gains for beating CNH Industrial if it beat Deere to market with the new type picker were enormous.

18. Upon information and belief, CNH Industrial knew that there were deep-set, inherent problems in its new picker's design and manufacture such that the Module Express picker would never operate correctly, and that to resolve these problems would require fundamental changes and significant delay. Delay of that magnitude would result in that Deere dominating the market before CNH Industrial could sell the new type of picker. And so, upon information and belief, CNH Industrial made a financial decision to push its picker to market first, although the picker it would market and sell was irreparably flawed.

19. In October 2006, CNH Industrial introduced its new picker, the Case Module Express 625. The Module Express, as represented, was designed to pick cotton at more than three miles per hour whether on wet or dry ground, while at the same time forming the picked cotton into a well-formed rectangular module that could be deposited in the field. This was represented to be accomplished by one person operating the Module Express. The rectangular module it was to create was 8 feet by 8 feet by 16 feet, half the size of a traditional cotton module, and up to 10,000 pounds in weight. Purportedly, a new auger system and software in the module building

---

[1] Notably, CNH Industrial appears to have since let its 2001 patent for the Module Express packing system lapse, and has rather filed patents for alternative packing systems; essentially recognizing that the system it sold to farmers as workable is untenable.

section of Module Express would consistently pack the cotton such that it would create a domed top and hold together when deposited in the field, allowing the module to be manually covered with a tarp and later transferred to the gin. This would allow cotton famers to trade in their current picker, buggy, and module builder for a single piece of equipment which would accomplish all three tasks more quickly, more efficiently, and with less labor and operating costs than previously. This was immensely attractive to farmers at this time as economic conditions for farmers, and cotton farmers in particular, had been worsening for some time.

20.    CNH Industrial priced the Module Express at nearly $500,000. This is far more than a traditional picker, and CNH Industrial priced it with the intent of capturing much of the purported cost savings CNH Industrial promised farmers they would see through the "revolutionary" Module Express. At some point, CNH Industrial changed the model number of the Module Express to 635. Upon information and belief, CNH Industrial implemented the model number change, not as a legitimate delineation between substantively different pickers, but as part of CNH Industrial's larger scheme to control fallout from the faulty 625 designation through rebranding, much like when Ford sold rebranded Pintos as Bobcats. CNH Industrial all the while continued to make the same representations about the ability of the Module Express to be operated by one person and to create consistent modules.

21.    As discussed below, CNH Industrial carried out a consistent scheme to deceptively market and sell the Module Express. CNH Industrial made specific, factual representations that were wholly untrue with the intent and effect of inducing farmers to purchase Module Express pickers. This scheme had the effect of inducing Plaintiff to purchase three Module Express pickers over a number of years.

22.    The Module Express was and is hugely flawed; a result of deep-set manufacturing

failures and defective design, that CNH Industrial rushed to market and sold to unsuspecting farmers knowing that it would never operate as promised. CNH Industrial sold these pickers based upon misrepresentations, then falsely assured farmers that "patches" and fixes were coming that would fix the unfixable machine.

23.     CNH Industrial also represented that new model years of the Module Express would live up to the representations CNH Industrial continued making and that the problems farmers were experiencing would be fixed.

24.     CNH Industrial's intentional, long-running scheme caused many thousands of dollars in damage to Plaintiff.

<u>**CNH Industrial's Misrepresentations to Plaintiff**</u>

25.     CNH Industrial has consistently made statements regarding the Module Express pickers which are untrue, deceptive and misleading, with the intent and effect of inducing farmers, including Plaintiff, to buy an incredibly expensive—and important—pieces of equipment that would never operate as promised or reasonably expected and which would be worth far less than it should be after purchase.

26.     CNH Industrial engaged in its marketing scheme through a coordinated, centralized effort emanating from its Racine, Wisconsin headquarters. CNH Industrial executives located there determined how to market and represent the Module Express, and disseminated those materials to the public, through in person communication, through press filings, through uniform marketing documents included in publications and distributed to dealers, and through promotional videos available to the public. All representations alleged herein were "made" in Wisconsin in that they were caused to exist and emanated from CNH Industrial's headquarters in Racine, Wisconsin.

27.     Although CNH Industrial used multiple avenues to disseminate false, misleading,

and deceptive representations, the singular narrative thread, and indeed many of the chosen words, among all representations was that the Module Express was a reliable machine that was powerful; that with the Module Express one person could perform all harvesting and module building tasks; and that the Module Express would both pick cotton and build consistent, well-formed, domed cotton modules. None of this was true.

28. Plaintiff was exposed to CNH Industrial's misrepresentations through different channels and relied upon them in purchasing each of his Module Express pickers. First, before he purchased any Module Express pickers, Plaintiff received representations regarding the Module Express pickers at the Mid South Gin Show in Memphis, Tennessee. Plaintiff communicated with CNH Industrial employees about the capabilities of the Module Express pickers. This included representations that the Module Express would create consistent, domed modules.[2] This also included representations that the Module Express pickers allowed for a one-man picking and baling operation (as CNH Industrial liked to phrase it: "one man, one machine").[3] Plaintiff also communicated with Trent Haggard about these capabilities.

29. Second, before he purchased any Module Express pickers, Plaintiff received representations regarding the Module Express pickers through articles he read in agricultural

---

[2] 2009 CNH Industrial website, available at https://web.archive.org/web/20081115050612/http://www.caseih.com/products/series.aspx?seriesid=2880&navid=105&RL=ENNA; 2015 CNH Industrial website, available at https://web.archive.org/web/20151021060133/http://www.caseih.com/northamerica/en-us/products/harvesting/module-express-cotton-pickers; 2017 and 2018 CNH Industrial website, available at https://www.caseih.com/northamerica/en-us/products/harvesting/module-express-cotton-pickers; *See* June 21, 2007 CNH Industrial public press release, available at https://www.farmprogress.com/cases-new-board-module-builder-technology.

[3] FarmProgress "Case introduces first module-building cotton picker," Oct. 19, 2006, available at https://www.farmprogress.com/case-introduces-first-module-building-cotton-picker; CNH Industrial, "Module Express ™ 625," available at https://www.toytractortimes.com/files/CIH9250604.pdf.; "Case IH Module Express – 1 Man. 1 Machine." Dec. 19, 2007. Available at https://www.youtube.com/watch?v=ZRhsAsHT68w.

publications including Delta Farm Press, Progressive Farmer, and/or Cotton Producer. Like all of CNH Industrial's representations, these articles again stated that the Module Express allowed for one-man picking and baling operations and would produce consistent, domed modules.

30.     Notably, CNH Industrial's representations were specific and meaningful, designed to induce farmers to purchase the faulty Module Express pickers.  These were not representations of opinion on a matter of judgment or puffery—*e.g.* that the Module Express picker was the "smarter choice" or the "best"—but rather representations of fact that may be objectively proven as false and which Plaintiff will prove as false.  These representations have specific meanings within the cotton industry. They were not limited to one model or model year of Module Express pickers, and CNH Industrial continuously made these representations. Industry usage and context confirms that CNH Industrial's representations to farmers in selling the Module Express are measurable, quantifiable metrics which can be proven false.

31.     These specific representations made by CNH Industrial from its Wisconsin headquarters to the public, including Plaintiff, were false, deceptive, and misleading. The Module Express pickers that Plaintiff purchased failed to operate as CNH Industrial promised. They failed and broke down in the field quickly and often, needed continual repairs, and were not reliable enough such that Plaintiff could use them throughout a cotton harvest. The Module Express pickers did not have sufficient power to pick cotton in diverse terrain or weather; they broke down, bogged down, and elements related to the hydraulic system failed or got stuck, especially in colder weather. The "alarm" systems of the Module Express pickers went off constantly, inaccurately identifying problems. The module packing system failed to create consistent, domed, rectangular modules that would hold together and be weatherable. Multiple people were required to conduct the picking and baling operations – contradicting CNH's central representation, and prime selling point, that the

Module Express would be a "one-man, one machine" picking operation.

32.     CNH Industrial's representations were untrue, deceptive, and, upon information and belief, CNH Industrial knew them to be so, but acted intentionally and aggressively to continue to sell the high-priced Module Express pickers to unsuspecting farmers, and to falsely claim that previous problems had been remedied.

33.     Each of these representations materially induced Plaintiff to purchase his Module Express pickers. Plaintiff relied upon these representations in connection to the purchase of all of his Module Express pickers, and would not have purchased any of his Module Express pickers, or paid what he did for them, if he had known these representations were untrue. These representations were continually made by CNH Industrial about all of their pickers.

34.     Plaintiff relied upon additional representations in deciding to purchase his Module Express pickers. CNH Industrial representatives came to Plaintiff's farm after he experienced significant performance problems with his first Module Express 625, purchased in 2008.  The CNH Industrial representatives represented that any problems with the machine were isolated to that machine and that, contrary to the serious design and manufacturing flaws which CNH already knew all Module Express pickers possessed, claimed to Mr. Holder that the Module Express pickers generally operated up to CNH Industrial's representations.

35.     Plaintiff relied upon this representation, as well as representations CNH Industrial had previously made, to trade in the first Module Express 625 and purchase his second Module Express 625. This representation that the Module Express pickers generally performed consistently with CNH's representations, also had the purpose and effect of preventing Plaintiff from realizing his legal claims. With later purchases, Plaintiff was told that the Module Express 635 was a better picker than the 625s that had been malfunctioning. These representations were directed by CNH

Industrial and reflective of its representations to the public and guidance to dealers which asserted that the 635 had design changes that would actually allow for the creation of consistent, domed modules and a one man operation.[4] These representations further induced Plaintiff, in addition to the claims CNH Industrial continuously made, to purchase his Module Express 635 pickers, and prevented him from realizing his claims.

**The Module Express Pickers Have Significant Design And Manufacturing Defects**

36.     The Module Express pickers have significant design and manufacturing failures. CNH Industrial, upon information and belief following investigation, pushed the Module Express to market knowing that it had significant design flaws, particularly in the hydraulic, power, and module-forming components.  Such flaws manifest themselves often, and specifically in the case of Plaintiff, in a lack of sufficient power to operate in diverse terrain and weather conditions, failure to create consistent, well-formed modules, and lead to the necessity of more than one operator for picking and baling operations, as well as consistent eventual failures and break-downs in the Module Express pickers. CNH Industrial attempted to purportedly remedy some of these issues through multiple software patches, but was unable to do so.

37.     These failures and design shortcomings, all of which CNH Industrial was aware before it ever marketed the Module Express, rendered false its representations regarding the "one man, one machine" operational capabilities and the ability of Module Express pickers to create consistent well-packed modules.

38.     Further, CNH Industrial experienced continual and widespread manufacturing failures at the plant in which the Module Express pickers are made.  All Module Express pickers

---

[4] *See, e.g.,* "CASE IH MODULE EXPRESS 635" available at
https://assets.cnhindustrial.com/caseih/NAFTA/NAFTAASSETS/Products/Harvesting/Module-Express-Cotton-Pickers/Brochures/Cotton_Module_635_Handout_CIH10141101_1-11.pdf

in the United States were manufactured at a plant CNH Industrial owns and operates in Benson, Wisconsin. From the beginning of the Module Express production, and consistently to this day, the Benson plant has had widespread problems with the manufacturing, workmanship, and assembly of Module Express pickers that caused the pickers to be faulty and to break down quickly and continually in the field. Upon information and belief, CNH Industrial was well-aware of the problems with implementing and controlling an effective manufacturing processes for the Module Express and repeatedly changed management at the Benson plant to try to correct them, but was unable to correct the design and manufacturing flaws with the Module Express pickers.

### Plaintiff's Module Express Pickers

39.     In 2008, based upon CNH Industrial's representations identified above, Plaintiff purchased a new Module Express 625 acquired at Eldridge Supply Company. Plaintiff experienced problems with this machine immediately. It was underpowered, and would not pack consistent, domed modules – one of its primary functions, and one of the key selling points touted by CNH. Plaintiff had to expend labor to pick up loose cotton and attempt to transport the poorly-constructed modules to the cotton gin, immediately disproving CNH's other key selling point – that the Module Express was a "one man, one machine" solution.

40.     Because of the problems Plaintiff was experiencing, CNH Industrial sent a representative to Plaintiff's operation. The representative convinced Plaintiff that the problems with the machine were isolated and convinced Plaintiff to trade in the Module Express 625 for a different new Module Express 625 from Eldridge Supply Company. Plaintiff believes that this machine bore Serial No. Y8T013826. Plaintiff experienced similar issues with this Module Express.

41.     After attempting to use this Module Express for three harvest seasons, Plaintiff

relied upon CNH Industrial's continued representations and purchased a new Module Express 635 in 2012 (Serial No. YCT017809) from Eldridge Supply Company. Plaintiff experienced the same problems with this Module Express 635 picker.

42. In 2017, Plaintiff again relied upon CNH Industrial's representations and purchased a Module Express 635 picker (Serial No. YHT021820) at Progressive Tractor and Implement Co., LLC in McGehee, Arkansas. This picker was also plagued with problems. The row spacing was set up incorrectly. The lights on the machine did not operate correctly. Its headers were not manufactured or designed correctly. The spindles were not correctly shimmed. Plaintiff experienced similar problems with this picker as the others. False "alarms" within the electrical system constantly went off. It would take two to three hours to warm the machine up and it would not operate in cold weather. It could not pack consistent, domed modules and did not allow for a one man picking and baling operation.

43. Throughout all of this time CNH through its representations, representatives, and dealers, continued to represent that the problems with the Module Express pickers were fixable and not the result of deep design and/or manufacturing flaws across all Module Express pickers.

44. The continued problems across all of Plaintiff's Module Express pickers left him with thousands in damages and debt. Plaintiff could not continue paying for his failed, defective 2017 Module Express 635 and it was repossessed, further damaging Plaintiff.

### How CNH Industrial Sold New Module Express Pickers

45. CNH Industrial is directly involved in the sale of each Module Express and operates as a party to each sales contract through its financial and agency relationship with dealers and CNH Industrial Capital. The process by which new and used Module Express pickers arrive at an authorized CNH Industrial dealer, and how ownership eventually transfers from CNH Industrial

to the farmer is complicated and, at all times, tightly controlled by CNH Industrial.

46.     CNH Industrial retains an ownership stake and directly participates in the new pickers that are sold through CNH dealer locations. When a dealer takes delivery of a Module Express, it is deemed to owe CNH Industrial some given amount—through CNH Industrial Capital[5]—that will be paid out of the eventual amount that is paid by a purchaser. However, the amount that the dealer actually "owes" is not finalized upon delivery of the Module Express to the dealer, nor is it generally paid at that time. Rather, it is subject to change based entirely on the actions of CNH Industrial, which may change or set the sales price (or other financial factors) to shift the proportion of the sales amount passing to the dealer.[6]

47.     When the dealer receives an offer for the purchase of a new Module Express from a farmer, CNH Industrial is informed as to the proposed price and the value of equipment the farmer is trading in through the Case Communication Network. Then, in every sale of a Module Express, CNH Industrial negotiates or offers to the dealer what portion of that purchase price will be retained by the dealer, as opposed to flowing to CNH Industrial for the picker itself.  Then, and only then, can the dealer consummate a sale to the farmer. This serves two purposes.  First, it allows for consummation of the sale. Without CNH Industrial's involvement in the terms of the

---

[5] CNH Industrial Capital is the financial services provider for all of CNH's American operations from finance agreements with farmers to inventory finance services between dealers and CNH Industrial. These two entities share ownership, resources, and management. Plaintiff, upon investigation, believe and allege that they are effectively the same entity, and CNH exercises complete control over the relevant financial aspects, and does so to create a false distinction between the sales and financial roles for the purpose of unlawfully attempting to limit liability. The exact contours of the relationship between CNH Industrial and CNH Industrial Capital are private but discovery will flesh out the full nature of the shared interests and coordination between these entities.

[6] Unlike automobiles, Module Express pickers do not have formal "titles." Ownership in these transactions is connected to financial interest in the value of the machines.

sale, and negotiation of what dealers will pay for pickers to CNH Industrial at the time of sale, dealers would not complete the sales of new pickers. Second, it is only after the time of sale to a farmer that the amount the dealer actually "owes" CNH Industrial Capital—in terms of amount of the purchase price—is ultimately determined. The decision of how much the dealer must pay comes through a process known as settlement that involves the dealer, CNH Industrial, and CNH Industrial Capital. During this process, CNH Industrial decides how much the dealer owes for the inventory of which it took delivery. If the piece of equipment was sold to the farmer, the money that CNH Industrial has provided in the sale to the farmer is applied to and lowers the amount owed for the sale. The amount "owed" is then paid to CNH Industrial from the purchase price for each and every Module Express after it is sold.

48.     However, in some instances, no amount the dealer owes to CNH Industrial for pickers may truly be "paid" by the dealer. This is because, in a large percentage of transactions with farmers, CNH Industrial Capital is the entity that finances the purchase. In such situations, a farmer pays CNH Industrial Capital (and thus CNH Industrial) and the dealer would owe CNH Industrial nothing for the picker itself, instead retaining a credit (effectively a commission) for selling the picker against its total balance. If the piece of equipment was not sold, CNH Industrial may take other actions to decrease the amount owed by the dealer, such as forgiving the interest due.

49.     This settlement process is controlled by CNH Industrial and does not take place upon delivery of the Module Express to the dealer.  The delivery of the Module Express to a dealer does not divest CNH Industrial in its ownership interest of the Module Express pickers. Indeed, often farmers order pickers from CNH Industrial through the dealers, who simply are intermediaries which retain a portion of the proceeds for their role in the sale.  CNH retains a

significant financial interest in the Module Express pickers which it recoups only after the time of sale to a farmer. CNH Industrial continues to perform essential ownership functions to finalize the sale of its Module Express picker to the farmer and to determine how much of the purchase price the dealer would, ultimately, "pay" it—if only on paper—for the Module Express. CNH Industrial's involvement in each Module Express sale is not completed until it determines the terms of the dealer's acceptance of the goods and the sale to the farmer is completed.

50.     Further, this involvement not only makes CNH Industrial a direct party to the sale but, because CNH Industrial's financial interest in the ownership of the Module Express is not extinguished, the dealer acts as CNH Industrial's agent in selling the Module Express pickers. CNH Industrial still has an ownership interest in the Module Express pickers and receives part of the purchase price. CNH Industrial authorizes the dealer to sell the machines it still owns at terms it dictates and then CNH Industrial then gets part of the purchase price.

51.     Upon information and belief, each and every Module Express picker purchased by Plaintiff was subject to these practices, and thus CNH Industrial was a party to each sales transaction. Further, CNH Industrial was directly and intimately involved in Plaintiff's purchase of his second Module Express 625, as described above.

### CNH Industrial Cannot Waive The Remedies Afforded Under Implied Warranty

52.     CNH Industrial was a party to each and every sale of a Module Express to Plaintiff, and the implied warranty of merchantability attaches.

53.     Any attempt by CNH Industrial to limit or waive the implied warranty of merchantability is ineffective for two reasons.  First, any express warranty that may be valid fails in its essentially purpose.  CNH Industrial, given ample opportunity, repeatedly failed to adequately repair Module Express pickers, which did not subsequently operate as equipment free

of defects should operate. Plaintiff suffered innumerable and continuing breakdowns and performance issues with their Module Express pickers. Any express warranty remedies do not provide a fair quantum of remedy, as CNH Industrial could not, and would not, adequately repair or replace failing Module Express pickers, effectively depriving purchasers (including Plaintiff) of the benefit of the bargain. Therefore, any purported limitations of remedies or waiver of implied warranties in any express warranty are invalid.

54. Second, CNH Industrial cannot limit or waive the warranty of merchantability as any such attempts were made after contracting. *Taterka v. Ford Motor Co.*, 86 Wis. 2d 140, 149 (1978). When Plaintiff purchased Module Express pickers from CNH Industrial at a dealer, they agree to do so through initial documents which do not contain waivers and limitations. To the extent a warranty that purports to limit or waive remedies or warranties is subsequently provided, it is after such agreement is already made, and therefore is without legal effect.

**Equitable Estoppel, Tolling, and Accrual of The Applicable Statutes of Limitation**

55. Plaintiff, despite all due diligence, could not obtain vital information relevant to the existence of the claims brought in this lawsuit. A reasonable person would not know that the diminished value and faults in the Module Express could possibly due to CNH Industrial's wrongful and intentionally wrongful conduct. Plaintiff could not have discovered, through the use of reasonable diligence, that CNH Industrial's conduct was unlawful and actionable within the time period of any applicable statutes of limitation. Nor could he have determined with the exercise of any reasonable diligence that the value of the Module Express would decrease precipitously, or that CNH Industrial would intentionally manipulate the resale value of the Module Express pickers.

56. Throughout the relevant time period, CNH Industrial actively concealed the

wrongful conduct at issue in this case, failed to disclose from Plaintiff material information concerning the defective design and manufacture of the Module Express pickers, and CNH Industrial's actions with regard to suppress the resale value of the Module Express pickers. CNH Industrial made false statements, many of which are described above, designed to prevent Plaintiff from filing suit during the applicable statute of limitations, including that the problems associated with the new and used Module Express pickers could be fixed and were fixed by changes to design. Upon information and belief, CNH Industrial acted knowingly and intentionally to ensure that Plaintiff could not discover the nature and extent of the conduct giving rise to the claims brought herein, and Plaintiff was prevented from suing within the statute of limitations. As a result, Plaintiff could not have discovered his claims, the issues with the Module Express pickers, or the conduct of CNH Industrial at issue in this litigation through the use of reasonable efforts or reasonable diligence.

## <u>FIRST CLAIM FOR RELIEF</u>
### Violation of the Wisconsin Deceptive Trade Practices Act

57.     All allegations and paragraphs in this Complaint are incorporated by reference into this claim.

58.     CNH Industrial is a "person, firm, corporation or association" as defined by Wisconsin Statutes § 100.18(1).

59.     Plaintiff is a member of "the public" as defined by Wisconsin Statutes § 100.18(1).

60.     With the intent to sell, distribute, or increase consumption of merchandise, services, or anything else offered by CNH Industrial to members of the public, CNH Industrial made, published, circulated, and placed before the public--or caused (directly or indirectly) to be made, published, circulated, placed before the public--advertisements, announcements, statements, and representations which contained assertions, representations, or statements of fact which are untrue,

deceptive, and misleading.

61. Such representations include specifically that Module Express pickers allow for one person to operate the Module Express to successfully perform cotton picking and baling functions, and that the Module Express has the ability to pack and deposit consistent, domed modules.

62. These representations also include that any problems with the Module Express pickers are fixable and that they could operate in line with CNH Industrials representations; and that design changes and improvements in the Module Express 635 allowed it to live up to CNH Industrial's representations.

63. These representations were false, deceptive, and misleading the inherent design and manufacturing defects in all Module Express pickers that were known to CNH Industrial at the time it made those representations could not accomplish these tasks. CNH Industrial made these representations in relation to the sale of both 625 and 635 Module Express pickers. CNH Industrial acted knowingly and intentionally with the purpose of causing and inducing Plaintiff to purchase Module Express pickers which CNH Industrial knew to be faulty, defective, and which would not operate as promised.

64. CNH Industrial also engaged in such untrue, deceptive, and misleading conduct as part of a plan or scheme the purpose or effect of which was not to sell merchandise as advertised and induce an obligation; in this case in the form of purchasing Module Express pickers.

65. As set out above, CNH Industrial makes these representations consistently in marketing materials, in in-person promotional statements, and in articles in periodicals.

66. As set out above, the representations and scheme CNH Industrial enacted through them emanated from Wisconsin. CNH Industrial controls all marketing, manufacturing, and selling of the Module Express pickers from its corporate headquarters in Racine, Wisconsin. The

representations at issue here were "made" in Wisconsin in that CNH Industrial "caused them to exist" from Wisconsin, and they were part of a nation-wide scheme whereby they were disseminated from Wisconsin across the country.

67.     As set out above, Plaintiff was exposed to and materially induced by these consistent marketing statements. Plaintiff relied upon representations that Module Express pickers allow for one person to operate the Module Express to successfully perform cotton picking and baling functions and that the Module Express has the ability to pack and deposit consistent, domed modules. Plaintiff encountered these representations through in-person communication (with CNH Industrial representatives at a trade show), through reading an article in an agriculture periodical, and through other means. These representations were made before the parties entered into a contractual relationship to purchase the respective Module Express pickers which is the source of pecuniary loss for Plaintiff.

68.     The representations caused a pecuniary loss to Plaintiff in that he relied upon them and incurred damages as a direct result thereof. Through its conduct, CNH Industrial intended to— and in fact did—materially induce Plaintiff to purchase Module Express pickers which directly and proximately resulted in pecuniary losses, including not receiving the benefit of the bargain in purchasing the Module Express pickers, incurring transactional costs, purchasing equipment which lost value precipitously and was not re-sellable, losing time and money through inoperable equipment, and incurring monetary costs associated with faulty equipment during harvest.

69.     Plaintiff seeks to recover his damages, including but not limited to diminution of value, cost of repair or replacement, refund of full purchase price, attorney's fees under Wisconsin Statutes § 100.18(11), costs, injunctive relief, and punitive damages.

## SECOND CLAIM FOR RELIEF
**Breach of Implied Warranty of Merchantability**

70.     All allegations and paragraphs in this Complaint are incorporated by reference into this claim.

71.     CNH Industrial sold goods, specifically the Module Express pickers, to Plaintiff. CNH Industrial is in the business of manufacturing and selling such goods and does so regularly.

72.     These goods were not merchantable at the time of sale. They were not fit for the ordinary purpose for which such goods are used, specifically for harvesting cotton and forming it into modules.  Nor were they of average quality, as set out above.

73.     CNH Industrial has actual knowledge of the particular defects at issue in this case through internal communications and reports (tracking complaints from dealers detailing flaws in the Module Express pickers), direct complaints from customers and the public, and internal testing. CNH Industrial, at the corporate executive level, from its Racine, Wisconsin headquarters, is in constant contact with its highly-controlled dealers, both in the United States, and in other parts of the world in which cotton is produced and CNH Industrial sells pickers (South America, for example). CNH Industrial monitors cotton harvests and the operation of its pickers in such harvests and was continually aware of the defects in the Module Express pickers.  CNH Industrial received notice of the defects through complaints received by, and repairs conducted by, their controlled dealers, who were aware of the defects in the Module Express pickers and reported such defects to CNH Industrial.  Additionally, CNH Industrial has received actual notice through other lawsuits which address such defects.

74.     Plaintiff has been damaged by CNH Industrial's breach of the implied warranty of merchantability through purchasing and owning Module Express pickers that do not operate as represented, were not fit for the purpose they were sold, including through diminution of value of the Module Express pickers, costs of repair and replacement, lost crops, increased crop processing

costs, loss of use of the Module Express pickers, additional labor costs incurred, and other damages.

75.     As set out above, any attempt by CNH Industrial to limit the implied warranty of merchantability was ineffective because such limitations were given after purchase of the Module Express pickers, and because any limitations failed their essential purpose.

## THIRD CLAIM FOR RELIEF
### Unjust Enrichment

76.     All allegations and paragraphs in this Complaint are incorporated by reference into this claim.

77.     To the extent necessary, this count is pled in the alternative to the other counts.

78.     CNH Industrial received money from Plaintiff which in justice and equity it should not be permitted to keep. The benefit conferred by Plaintiff was non-gratuitous, CNH Industrial realized value from this benefit, and CNH Industrial has knowledge of that benefit.  It would be inequitable for CNH Industrial to retain this benefit without payment of the value to Plaintiff.

## PRAYER FOR RELIEF

Plaintiff seeks:

(1)     all damages not recoverable or recovered through class adjudication, including but not limited to direct and indirect pecuniary loss, consequential damages, and a refund of purchase prices;

(2)     reasonable attorney's fees and costs;

(3)     injunctive relief;

(4)     full restitution of all amounts paid to Defendant;

(5)     punitive damages, and

(6)     all other relief which the Court or jury should find appropriate.

**Plaintiff demand a trial of all claims by struck jury.**

Dated: June 5, 2020                    Respectfully submitted,

                                       /s/ John Rainwater
                                       John Rainwater
                                       Robert L. Beard
                                       **RAINWATER, HOLT & SEXTON, P.A.**
                                       P.O. Box 17250
                                       Little Rock, AR  72222
                                       (501) 868-2500
                                        (501) 868-2508 (fax)

                                       /s/ John D. Blythin
                                       Shpetim Ademi (SBN 1026973)
                                       John D. Blythin (SBN 1046105)
                                       Mark A. Eldridge (SBN 1089944)
                                       **ADEMI & O'REILLY, LLP**
                                       3620 East Layton Ave Cudahy, WI 53110
                                       (414) 482-8000
                                       (414) 482-8001 (fax)
                                       sademi@ademilaw.com
                                       jblythin@ademilaw.com
                                       meldridge@ademilaw.com